IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KOCH BUSINESS HOLDINGS, L.L.C.,

Plaintiff,

vs.

Case No. 05-1237-JTM

AMOCO PIPELINE HOLDING COMPANY,

Defendant.

MEMORANDUM AND ORDER

This case involves a contract dispute between plaintiff Koch Business Holdings and defendant Amoco Pipeline Holding Company (APHC). The matter is now before the court on defendant APHC's Motion for Summary Judgment, which argues that the court is without personal jurisdiction.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

APHC is incorporated in the State of Delaware with its principal place of business in Warrenville, Illinois; its primary business is to hold stock in its wholly-owned subsidiaries, which in turn are partial shareholders in numerous joint ventures. APHC also directly holds less than a 100% interest in several additional subsidiaries, none of which have business operations in Kansas.

APHC does not maintain a business location or office in Kansas, nor does it own, use or possess any real property in Kansas or maintain files, documents or other business records in Kansas. It does not have a telephone listing in Kansas, nor does it solicit business or run any advertisements in Kansas. APHC does not pay taxes or file a tax return in Kansas; nor does APHC have a bank account in Kansas or derive revenue from goods used or services performed in Kansas. APHC is not registered to do business in Kansas, does not transact business in Kansas, and does not have an agent for service of process in Kansas. APHC has no employees in Kansas, nor are any of its officers or executives located in Kansas.

APHC is a wholly owned subsidiary of BP Pipelines. BP Pipelines and BP America are both companies authorized to transact business in the State of Kansas, and both have a registered agent in Kansas for service of process.

Prior to November 2002, APHC owned an interest in the Colonial Pipeline Company and Colonial Ventures, LLC. The Colonial Pipeline Company is a Delaware and Virginia corporation with its principal office in Georgia. Colonial Pipeline operates a petroleum pipeline running through the southeastern United States from Houston, Texas to the New York harbor. The pipeline does not run through Kansas. Colonial Ventures, LLC is a Delaware limited liability company, with its principal offices in Georgia. Colonial Ventures does not engage in business in Kansas.

In or around June of 2002, APHC finalized a Confidential Information Memorandum ("CIM") in connection with its intent to divest its interests in Colonial. The CIM was provided to a select number of potential bidders whom APHC believed may have had an interest in purchasing APHC's interest in Colonial.

During June of 2002, APHC's parent BP Pipelines contacted Koch in Wichita, Kansas to solicit Koch's participation in a joint marketing effort to sell the shares of Colonial Pipeline stock as a block in an attempt to obtain a better price. BP Pipeline's shares were held in the name of APHC.

BP Pipelines, through Donald J. Kienstra and others, had numerous contacts directly with employees of Koch in Wichita, Kansas to solicit Koch's participation in the joint marketing effort. The parties exchanged drafts of a proposed Collaborative Marketing Agreement ("CMA"), which was prepared by BP Pipelines and which the parties discussed over a period of approximately 45 days.

In response to the CIM, several bidders engaged in due diligence and submitted offers to APHC to purchase its interests in Colonial. The CIM expressly required bids to be submitted to BP Pipelines and BP America, and prohibited contact directly with APHC to make a bid. The due diligence visits took place in Alpharetta, Georgia, and none of the bidders was located in Kansas.

On or about September 13, 2002, Buckeye submitted a bid.  Buckeye is a limited partnership organized under the laws of Delaware, with its principal offices located in Pennsylvania.

Just before the CMA was executed, Koch learned that Buckeye Partners had submitted a non-binding offer to BP Pipelines. Koch decided to hold off on jointly marketing its shares, and instead decided to evaluate the potential for purchasing APHC's shares pursuant to Koch's right of first refusal.

APHC entered into a Purchase and Sale Agreement with Buckeye on or about October 2, 2002, under which Buckeye agreed to purchase APHC's interest in Colonial.  During the due diligence process and the negotiation and execution of the Buckeye Agreement, stretching from July 2002 to October 2, 2002, there were no in-person meetings between representatives of APHC and Buckeye which took place in Kansas, and no one from APHC traveled to Kansas in connection with due diligence or the negotiation or execution of the Buckeye Agreement. Schedule 3A of the Buckeye Agreement contained a provision for the payment of a $5 million post-closing payment, above and beyond the purchase price, upon the occurrence of certain conditions (the "Post Closing Payment").  The Buckeye Agreement recognized that other shareholders in the Colonial Pipeline Company had rights of first refusal in APHC's Colonial interest. At the time, Koch was a shareholder in Colonial.

On October 2, 2002, APHC sent a copy of the Buckeye Agreement to the shareholders in Colonial Pipeline along with a letter notifying the shareholders about the proposed transaction in accordance with the terms of the right of first refusal.  A copy of this solicitation was sent to Koch in Wichita, Kansas.

On October 21, 2002 and October 24, 2002, Koch sent letters to Colonial Pipeline and its shareholders, including APHC, exercising its rights of first refusal to buy APHC's shares under the Buckeye Agreement.  Between October 21, 2002 and November 4, 2002, APHC engaged in telephone negotiations and exchanged e-mails, facsimiles and other written correspondence with

Koch relating to the terms under which Koch was entitled to acquire APHC's interest in Colonial pursuant to its right of first refusal.

It is uncontroverted that the parties entered into discussions regarding Koch's purchase of APHC's Colonial shares. APHC, through its agents and representatives who were employed by BP Pipelines and BP America, initiated various contacts with Koch in Wichita, Kansas.

On November 1, 2002 and November 4, 2002, APHC and Koch executed a Purchase and Sale Agreement ("PSA") under which Koch bought APHC's interest in Colonial. The PSA contains a provision for the payment of the Post Closing Payment substantively identical to that contained in the Buckeye Agreement. It is APHC's entitlement to this Post Closing Payment that is the subject matter of the present action.

Between October 21 and November 4 there were no in-person meetings between representatives of APHC and Koch in connection with the negotiation or execution of the Koch Agreement, and no one from APHC traveled to Kansas in connection with the negotiation or execution of the Koch Agreement. APHC executed the Koch Agreement in Illinois, and faxed a copy of the executed agreement to Koch in Wichita.

On Friday, October 25, Rochelle Jackson, an employee in BP America, placed a call to Koch's counsel, Scott Flucke, in Wichita regarding revisions to the PSA. On October 28, Jackson sent an e-mail to Flucke at Koch in Wichita, advising that Koch should have a draft of the revised agreement by the end of the day. On October 30, at 12:59 a.m., Jackson sent another e-mail to Flucke at Koch in Wichita, attaching a marked copy of the revised PSA, and then at 2:44 p.m., sent another e-mail to Flucke asking whether Koch planned to issue a press release, and asking Koch for the opportunity to review the content and to notify BP of the timing. On October 31, Jackson called Flucke regarding the closing date and signatures for the PSA.

On October 31, Don Kienstra, an employee of BP Pipelines, e-mailed Flucke, providing wire instructions for Koch to wire the deposit for the purchase to BP Pipelines. Later that day, Jackson sent two e-mails to Flucke, the first discussing changes to the PSA, wire instructions and the press

release, and the second attaching a redlined and a clean version of the PSA with instructions for returning the executed signature pages.

On November 1, Daniel Pinkert, an officer of APHC, faxed an executed signature page for the PSA to Koch in Wichita.

On or about November 4, Jackson sent by overnight delivery a copy of the PSA that had been executed by Daniel Pinkert on behalf of APHC to Flucke.

Under the PSA, Koch was to pay a deposit to APHC in the amount of $12.5 million, obtain a letter of credit to guarantee payment of the $5 million post-closing payment under Schedule 3A to the PSA, pay the balance of the $295 million purchase price on the day of closing, and (if the conditions of Schedule 3A to the PSA were met) pay APHC an additional $5 million.

Koch was also required to assume certain obligations of BP Pipelines, the parent company of APHC. The PSA also provided that any and all notices were to be sent to BP America and BP Pipelines, with no notice to APHC.

Under the PSA, APHC warranted that it owned the shares of stock free and clear of any liens and encumbrances, and agreed to take all steps necessary to transfer those shares to Koch at the closing. The PSA also required the parties to split any dividend paid by Colonial for the quarter ending December 31 on a pro rata basis as set forth in Section 8, and the party receiving the dividend payment was required to wire the other party its share.

The PSA did not explicitly require APHC to engage in any act within Kansas in performance of its contractual obligations. Nor did it expressly require Koch to engage in any act within Kansas in performance of its contractual obligations.

The PSA specifies that the contract is to be construed and enforced in accordance with the laws of the State of Delaware. The only reference to Kansas in the Koch Agreement can be found in the Notice section of the contract, where Koch's mailing address, and that of its parent, are listed as being within Kansas. The Koch Agreement specifies that the closing of the Colonial transaction was to have taken place at the offices of BP Pipelines (North America) Inc. in Lisle, Illinois.

The PSA did require APHC to transfer the stock to Koch, which is located in Wichita. It also required Koch to perform by paying a deposit, obtaining a letter of credit, and paying the balance of the $295 million purchase price to APHC. All of these activities had to take place in Wichita, where Koch is located. In addition, the $5 million post-closing payment that is the subject matter of the present action had to be made by Koch from Wichita.

Flucke initiated and ordered a wire transfer from his office in Wichita, Kansas to pay the initial deposit of $12.5 million. Koch was directed to wire the money to the account of BP Pipelines. Flucke was the person with authority to initiate the wire transfer and was responsible for taking the actions necessary to approve and initiate the payment of the deposit required by the PSA. In order to pay this initial deposit, he had to authorize and approve the payment in Wichita, where he worked for Koch. In fact, Wichita is the only place where Koch employed people with authority to perform the tasks necessary to initiate the payment of the deposit.

Kevin Shelton, a Koch employee in Wichita, was responsible for procuring the letter of credit. All of the employees with authority to authorize and approve the issuance of the letter of credit are located in Wichita. Shelton completed the application for, and approved the terms of the letter of credit in Wichita, and was responsible for approving the terms of the letter of credit as issued and did this in Wichita.

The letter of credit was to secure payment, and was not intended to be used to actually make the post-closing payment. If the post closing payment under Schedule 3A had become due, all of the arrangements for such payment would have been made by Koch from Wichita, Kansas.

On November 12, 18, and 21, and on December 2, 10-12, Jackson sent a further thirteen e-mails to Flucke referencing or discussing the PSA and the upcoming (December 16) closing. On November 22, Jackson telephoned Flucke, leaving him a voice mail message regarding the closing. On December 12, Don Kienstra of BP Pipelines sent an e-mail to Flucke, with instructions for the wire transfer. On December 12 at 2:56 p.m., Debbie Martin representing APHC sent an e-mail to Flucke, verifying the date of the closing and the amount owed at closing, $282,436,986.30.

On December 16, Koch wired $282,436,986.30 to BP Pipelines.

After the closing on December 16, APHC and Koch had further communications regarding the allocation of the fourth quarter dividend to be paid by Colonial Pipeline and which was to be allocated between the parties pursuant to Section 8 of the PSA. Since APHC was still the record owner of the shares on December 12, the date when Colonial declared the fourth quarter dividend, it would receive the entire dividend from Colonial, and pursuant to the PSA, was required to forward on Koch's share.

On December 18, Don Kienstra sent an e-mail to Flucke, addressing the allocation of the Colonial dividend. On the same day, Beth Balser of BP Pipelines sent an e-mail to Flucke, asking for Koch's bank account information to prepare a wire transfer to Koch of its share of the Colonial fourth quarter dividend. Jackson sent e-mails to Koch regarding payment under the PSA on December 30 and 31.

On January 2, 2003 BP Pipelines caused an electronic funds transfer in the amount of $961,632 to be made to Koch Capital Investments Company LLC, 4111 E 37th Street, Wichita, Kansas, to pay Koch Business Holdings., LLC its share of the Colonial fourth quarter dividend under Section 8 of the PSA. The wire went through Bank One, Chicago.

The closing between Koch and APHC actually occurred in Alpharetta, Georgia on December 16, 2002.

Between the time of the execution of the Koch Agreement on November 4, 2002 and the closing of the Colonial transaction on December 16, 2002, there were no in-person meetings between APHC and Koch which took place in Kansas, and no one from APHC traveled to Kansas in connection with the execution of the contract or the closing of the transaction.

The payment received by APHC from Koch in connection with the closing of the Colonial transaction was wired from the State Street Corporation, which is located in Boston, Massachusetts. The letter of credit provided by Koch to secure the Post Closing Payment under Schedule 3A of the Koch Agreement, was drawn on a branch of the J.P. Morgan Chase Bank located in Florida.

On April 21, 2003, Rochelle Jackson sent a letter via overnight mail to Flucke in Kansas demanding payment of $5 million from Koch under Schedule 3A.

APHC has not, in connection with the circumstances giving rise to Koch's Petition, been accused of committing any tortious acts within Kansas, or of having caused any injury to persons or property within Kansas arising out of an action or omission outside of Kansas.

APHC has not acted within Kansas as a director, manager, trustee or other officer of any corporation organized under the laws of Kansas or having a place of business within Kansas, or acted as an executor or administrator of any estate within Kansas.

APHC has not contracted to insure any person, property or risk located within Kansas at the time of contracting, nor served as the insurer of any person at the time of any act by the person which is the subject of an action in a court of competent jurisdiction within Kansas.

APHC has not, in connection with the circumstances giving rise to Koch's Petition, entered into any express or implied arrangements with a corporation or partnership residing or doing business in Kansas under which such corporation or partnership supplied transportation services or communication services or equipment where such services or equipment are managed, operated or monitored within Kansas.

**Conclusions of Law**

As the plaintiff, Koch has the burden of showing that exercising personal jurisdiction over APHC is consistent with Kansas law and with due process. See *Bell Helicopter Textron, Inc. v. Heliqwest Int'l*, 385 F.3d 1291, 1295 (10th Cir. 2004). That is, it must demonstrate both that the exercise of jurisdiction is consistent with the Kansas long-arm statute, K.S.A. § 60-308(b), and present evidence demonstrating that the exercise of such jurisdiction is consistent with due process. *See Green County Crude v. Avant Petroleum*, 648 F. Supp. 1443, 1445 (D. Kan. 1986). The court finds that Koch has failed to meet this burden.

The only relevant portion of the long-arm statute is § 60-308(b)(5), which provides for jurisdiction against nonresidents who enter "into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state." This does not mean that the unilateral performance of some acts in Kansas render the other party to a contract subject to Kansas jurisdiction. The statute applies when the acts required by the contract will necessarily be performed in Kansas. *See Biederman v. Schnader, Harrison, Siegal & Lewis*, 765 F. Supp. 1057, 1059 (D. Kan. 1991) (long-arm provision applies to "the acts *required by the agreement*, at the location ... stipulated"); *Travel Marketing Assoc's v. Theatre Direct Int'l*, 2002 WL 31527737, at *2 (D. Kan. Oct. 8, 2002) (focus under statute is on "the timely execution of the acts required by the agreement, at the location and in the manner stipulated"); *Finance & Mktg. Assoc'n Int'l v. He-Ro Group*, 975 F. Supp. 1429, 1431 (D. Kan. 1997) (paragraph (b)(5) not applicable because the acts in Kansas were "entirely fortuitous" and "nothing in the agreement require[d] any acts to take place in Kansas"). Although Koch attempts to distinguish these decisions, the court finds no rational basis for so doing. Further, Koch provides no contrary authority in support of its position.

Here, some actions in connection with the contract were performed in Kansas, but the contract in no way required that those actions take place in Kansas. Koch stresses that it authorized payments from its Kansas headquarters, but the contract did not require this. As in *He-Ro* and *Green County*, § 60-308(b)(5) is not satisfied by Kansas actions which are prompted by the convenience of a plaintiff's Kansas headquarters, as opposed to Kansas actions required by the contract itself.

The subject of the contract involved the sale of non-Kansas companies (Colonial Pipeline and Colonial Ventures), and the agreement does not require the performance of any actions in Kansas. That some acts in furtherance of the contract occurred in Kansas is merely a fortuitous happenstance related to the presence of Koch in Kansas. It is uncontroverted that the contract does not require APHC to engage in any contractual performance within Kansas, and it is clear that the agreement did not expressly require Koch to take any particular action in performance of the contract

in Kansas. The only reference to Kansas in the agreement is in the recitation of the plaintiff's mailing address.

Further, even if the court were to focus on the actual performance of the parties under the contract, the facts fail to present a case under the long-arm statute. Here, the essential performance of Koch under the contract was to pay APHC. And here, payment was made to APHC from Boston, Massachusetts. Although Koch engaged in preparatory acts to assist in and authorize the payment, the payment itself involved the transfer of funds outside of Kansas. Similarly, while APHC may have engaged in additional contacts with Koch in Kansas, as set forth above, the overwhelming majority of these contacts involve negotiations on matters which were not mandated by or even necessarily relevant to the Koch Agreement.

Because the court finds that Koch has failed to demonstrate any statutory basis for the exercise of jurisdiction, the court does not reach the second question of whether the exercise of personal jurisdiction would violate due process.

Also before the court is Koch's Motion to Certify, which asks the court to certify to the Kansas Supreme Court a question relating to the proper interpretation of KSA 60-308(b)(5). APHC opposes certification, arguing that the motion is less a bona fide request for the relief sought than a pretext for offering a surreply without obtaining leave of the court. Given the timing of the motion,[1] this view may not be entirely inaccurate. However, the court need not resolve the matter, and finds in its discretion that certification is not warranted.

---

[1] Koch made no attempt to certify the question after APHC's original October 5, 2005 Motion for Summary Judgment, even though the interpretation of KSA 60-308(b)(5) was clearly the focal point of APHC's motion. (Dkt. No. 20). Instead, after obtaining three extensions of time to respond to APHC's summary judgment motion, (Dkt. Nos. 25, 29, 31), it filed a Response (Dkt. No. 32) which argues that APHC was wrong in its interpretation of the statute, but makes no mention of certifying the issue. Instead, Koch waited until one week after APHC's Reply brief, the last brief permitted as matter of right, to file its motion to certify. Moreover, the motion to certify itself makes no attempt to demonstrate all of the required elements for certification under KSA 60-3201, such as demonstrating how resolution of the issue would be dispositive of the case. Rather, the motion to certify is limited to continue re-argument of why, in Koch's view, APHC's interpretation of KSA 60-308(b)(5) is erroneous.

11

The decision to certify a question is discretionary. *Lehman Bros. v. Schein*, 416 US. 386, 391 (1974); *Albert v. Smith's Food & Drug Ctrs.*, 356 F.3d 1242, 1254 n. 7 (10th Cir. 1994); *Massengale v. Ok. Bd. of Exam'rs in Optometry*, 30 F.3d 1325, 1331 (10th Cir. 1994). Certification should generally be avoided. *Aid For Women v. Foulston*, 327 F. Supp. 2d 1273, 1288 (D. Kan. 2004). Even if the proper interpretation of state law is "difficult or uncertain," the federal courts retain "the duty to decide questions of state law." *Copier v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998). Certification should be used with caution because "it entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court." *Lehman Bros*, 416 U.S. at 394 (Rehnquist, J., concurring). The procedure should be limited to issues which are novel which would substantially simplify an action, and which would save "time, energy and resources." *Aid for Women*, 327 F. Supp. 2d at 1288-89. (These considerations are not present here. State long-arm statutes, including KSA 60-308(b)(5), have been the repeated subject of federal court interpretations.

Moreover, the court finds certification would serve to prejudice the defendant, which has and is vigorously resisting litigation of the present matter in Kansas. The issue is a straightforward matter of statutory interpretation; it is not so complex or intricate that certification is warranted. *See Bendis v. Federal Ins. Co.*, No. 89-2035-S, 1990 WL 26031, at *1 (D. Kan. 1990) (citing *Motor Vehicle Cas. Co. v. Atlantic Nat'l Ins. Co.*, 374 F.2d 601, 602 n. 1 (5th Cir.1967)).

Plaintiff here waited almost four months after the out-of-state defendant sought summary judgment on the action based on a lack of personal jurisdiction, and waited until after the completion of (lengthy and undoubtedly expensive) briefing on the summary judgment motion before first raising the possibility of certification. Certification is not favored where it is sought only after a resource-wasting delay. *See Bendis*, 1990 WL 26031 at *1. *See also Boyd Rosene & Assoc's v. Kansas Mun. Gas Agency*, 178 F.3d 1363, 1365 (10th Cir. 1999); *Roane v. Koch Industries*, Inc., 103 F. Supp. 2d 1286 (D. Kan. 2000). The extent of the delay from certification is an added consideration where a non-resident defendant is vigorously contesting the right of any court in

Kansas to litigate the allegations against it. *See Turman v. Ameritruck Refrig. Transp.*, 125 F. Supp.2d 444, 449 (D. Kan. 2000) (noting that "in the court's experience, certifying questions to the Kansas Supreme Court extends the resolution of cases by as much as one year"). *See generally* 17A Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 4248 173-74 n. 48-54 (1988).

Another factor weighing against Koch's request for state certification is the fact that Koch itself chose to bring this action in federal court. *See Masters v. Daniel Intern. Corp.*, 917 F.2d 455, 457 n. 2 (10th Cir. 1990) (denying certification request in part because plaintiff "chose to litigate his diversity action in a federal forum"). Thus, in *In re Seymour*, No. 93-1488-PFK, 1994 WL 404748, at *4 (D. Kan. July 21, 1994), Judge Kelly denied a motion to certify a question to the Kansas Supreme Court both because the motion was untimely and because the plaintiff herself had selected the federal forum. *See also Smith v. Johnson Propeller Co.*, No. 95-1406, 1996 WL 202674 (Fed. Cir. April 24, 1996) (enumerating factors relevant to certification, including "whether the party requesting certification initially chose the federal forum"); *Seaboard Sur. Co. v. Garrison, Webb & Stanaland, P.A.*, 823 F.2d 434 (11th Cir.1987); *City of Manchester School Dist. v. Crisman*, No. 97-632-M, 2001 WL 1326636 (D.N.H. Sept. 17, 2001).

The court finds that summary judgment is appropriate based on a lack of personal jurisdiction over the defendant. Accordingly, the court must either dismiss the matter without prejudice or transfer the action to an appropriate forum. The latter approach is preferred. *Viernow v. Euripides Dev. Corp.*, 157 F. 3d 785, 793 (10th Cir. 1998). APHC requests a transfer of the action to the Northern District of Georgia pursuant to 28 U.S.C. § 1631. In its Response to the Motion for Summary Judgment, Koch does not independently object to this resolution as opposed to dismissal without prejudice, and the court will grant the requested relief.

IT IS ACCORDINGLY ORDERED this 14th day of March, 2006, that the defendant's Motion for Summary Judgment (Dkt. No. 20) is granted, and the present action is accordingly transferred to the United States District Court for the Northern District of Georgia.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE
